## Johnson v. Louisville & Nashville Railroad Company.

(Decided February 1, 1918.)

### Appeal from Franklin Circuit Court.

1. Appeal and Error—Law of the Case—The opinion rendered on the first appeal is the law of the case in all subsequent proceedings covered by the opinion.

2. Appeal and Error—Negligence—Submission to Jury.—Where a case is reversed for cause of an utter failure to produce evidence of a negligent jerking start of the train, and upon the subsequent trial plaintiff gave evidence of an unusual, violent and unnecessary jerk which precipitated him from the platform, and introduced a new witness who testified to similar facts, the trial court should have submitted the question of negligence to the jury.

3. Carriers—Passengers—Submission to Jury.—In every case where a passenger is exercising ordinary care for his own safety and is thrown from a train by an unusual and unnecessary jerk or lurch in the operation thereof, he is entitled to go to the jury.

O'REAR & WILLIAMS and L. FRANK WITHERS for appellant.

T. L. EDELEN and SHELBY, NORTHCUTT & SHELBY for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

This is the second appeal of this case. The opinion on the first appeal is found in 168 Kentucky 351.

The case has been tried in the circuit court three times. On the first trial the jury awarded plaintiff damages in the sum of fifteen thousand ($15,000) dollars; this verdict and judgment was set aside and a new trial granted by the lower court. On the second trial plaintiff recovered a verdict of six thousand ($6,000) dollars, and

the motion and grounds for new trial being overruled, it was appealed to this court and reversed with directions to peremptorily instruct the jury to find for the defendant upon another trial if the evidence produced by plaintiff was substantially the same as upon the second trial.

Upon the third trial in the circuit court the jury was peremptorily instructed to find and return a verdict for the defendant railroad company, upon which verdict judgment was entered, and from which Johnson appeals, insisting that upon the third trial he introduced a new witness who gave evidence not only supplementing that given upon the other trials, but, in addition, testifying in substance that the train gave an unusual jerk in attempting to start at the time plaintiff was injured. Except for this new witness, Homer Wise, it is admitted the evidence is substantially the same as upon the second trial.

The rule of this court that the opinion on the first appeal on all points discussed therein, is the law of the case on all subsequent trials is too well established and too generally recognized to need re-statement or argument here. This rule is stated and recognized in the following cases: Kirchdorf v. Ward, 167 Ky. 298; Adams Express Co. v. Hoeing, 88 Ky. 373; Petit v. Marble, 18 R. 167; Louisville & Nashville R. R. Co. v. Queen City Coal Co., 99 Ky. 217; Schmetzer, by, etc., v. Louisville & Nashville R. R. Co., 19 Rep. 1713; Iser v. Davis, 18 Rep. 510; Brown, Assignee v. Marion National Bank, 18 Rep. 186; Hopkins v. Adams Roth Grocery Co., 105 Ky. 357; Martin v. Spurlock, 122 S. W. 125; Brooks v. City of Maysville, 151 Ky. 707; Mahoney v. Mentz's Assignee, 153 Ky. 484; Doherty v. First Nat. Bank, 161 Ky. 202.

In the first opinion the facts are found as follows:

"The proof shows that, notwithstanding the crippled condition of the plaintiff, he was perfectly able to walk about and go wheresoever he pleased. He resided with his daughter about four miles from Winchester and in going to town frequently walked part of the way and sometimes all the way, and on the day he made this trip he started from his home with a grip, or suit case, and after walking perhaps one-half of the way he rode into town in a vehicle with a traveler on the turnpike. He deposited his grip in a saloon where he drank a milk punch, and after leaving the saloon and visiting some places in town, he returned and drank another milk punch, and later on after engaging in other travels about the city,

and about 11:00 o'clock, he returned to the saloon and drank a third milk punch. At this time he purchased two pints of whiskey and put them in his grip, or suit case. He then went to the home of one Mr. Dougherty, where he had his dinner, and about 3:30 o'clock he left this place and went to the saloon and took out one of the pints of whisky and put it in his pocket and then went to the depot and purchased his ticket and subsequently boarded the train. He took his seat on the left hand side of the rear end of the smoking car, the next car following being the day coach, or ladies' car. He put his grip on the seat immediately in front of the one he was occupying, and there was sitting besides him a young man whose name does not seem to be known to any one testifying in the case, and who was not introduced as a witness. Other passengers, however, and indeed it is admitted by plaintiff, say that *en route* plaintiff offered to this fellow passenger a drink and at the same time took one himself. Plaintiff claims that his companion passenger accepted the drink, while other passengers did not see this, but testified that the plaintiff's offer was refused. However this may be, within a comparatively short while a controversy arose between the plaintiff and this passenger and the former became so loud and boisterous in his talk that it attracted the attention of other passengers in the car, the language used by him, as testified to by the witnesses, being by no means the most elegant. As a consequence of this he changed his place in the car, and by the time he got to Frankfort, he was unable to locate his grip, or suit case, and according to the proof made no effort either to find it or to alight from the train until after all of the passengers had gotten off and all those desiring to take passage had gotten on and many, if not all of them, had secured seats in the respective coaches. About this time some one suggested to him that the train had arrived at Frankfort, whereupon he began to search for his grip, and after finding it and after he got within three or four feet of the smoking car door going out, the train made the usual start without any jerk, unusual or otherwise, and by the time plaintiff got out upon the platform the train was cleverly started, and he, over the protest of the brakeman, and that of a Mr. Wilson, who is a citizen of Frankfort and whose testimony is both intelligent and convincing, undertook to jump off the car, which was then moving at a speed of from two to three miles per hour,

and in so doing fell and thereby sustained the injuries for which he sues.

"There is no dispute but that, at the usual place the station of Frankfort was announced in the usual way, and no testimony showing that the train did not stop upon this occasion the usual time, which was about three minutes. There is absolutely no proof that any unusual number of passengers crowded onto the car and *there was such an utter failure to produce evidence of any jerking start of the train that the plaintiff himself abandons this theory by failing to offer any instruction upon it.*"

Upon the last trial plaintiff, Johnson, testified and called a number of witnesses, including Homer Wise, a newsboy, who testified for the first time. The evidence of Homer Wise is largely cumulative, since it relates to subjects fairly covered by witnesses upon the first and second trial, but in addition he gives an account of the jerking of the train, and it is, therefore, contended that his evidence entitles the plaintiff to go to the jury upon the question of whether the train started with a sudden jerk, causing the injury of plaintiff. His evidence upon this subject is as follows:

"Q. What sort of a start did this train make? A. An unusual quick start. Q. What did you say about what kind of a start they made? A. A quick start. Q. What was the effect of that start on the train itself? (Defendant objected; sustained). Q. What did the train do and what did you hear, if anything? A. It made a jerk— an unusual jerk and I looked around and saw him fall off. Q. How close was his falling off to the jerk? A. I don't know—just as soon as it jerked he fell off. Q. Who did you see on the train, about the steps there where he fell? A. I never saw anybody—I never noticed. Q. Did you go back to where he was lying? A. No, sir, there was a big crowd around there and I couldn't get back. Q. What attracted your attention to the jerk of the train? A. Just the jerk. Q. Did it make any noise or not? A. Yes, sir. Q. What sort of a noise? A. A noise of a train starting off. Q. In what way did that start differ from the way it ordinarily started? A. It was louder. Q. How did he fall—you say he fell off? A. I don't know—I never saw him only just saw him falling off—I don't know which way he fell or nothing about it."

This evidence of Homer Wise corroborates and sustains that of plaintiff Johnson, wherein he tells of a sudden and unusual jerk of the train causing his fall and consequent injury. Johnson is somewhat more explicit in his evidence touching the starting of the train upon the third trial than before. In telling how he came to his injury Johnson said:

"Q. When you went to the train, tell the jury what occurred between you and one of the train crew, if anything, with reference to your crippled condition? A. After I went to the train? Q. Yes, sir, what conversation, if any, did you have, with reference to your crippled condition, with any member of the train crew? A. When I went to get on the train I didn't see any one standing there and had my suit case with me and I got hold of the handle-bar and looked up and saw a man standing there and he was dressed in a railroad uniform and I says: 'Take up my suit case, I am kind-a crippled up and can't get about very well,' and he took my suit case and I went on up. I told him to sit it down, that I could get it all right when I got up and he started to reach out his hand to help me, but didn't. I told him I could make it all right myself and then I asked him to see that I got off at Frankfort and he said 'All right' and walked toward the ladies' coach and I turned and walked into the rear end of the smoker. Q. You say when you asked him to see that you got off at Frankfort, he said 'All right?' A. Yes, sir, I asked him to see that I got off at Frankfort and he said 'All right.' Q. You got into the train? A. Yes, sir. Q. What coach did you go into? A. The smoker. Q. Where did you sit down? A. On the rear seat on the right hand side. . . . Q. Were you ever down at Frankfort before? A. No, sir. Q. As you neared Frankfort, was the station called by anybody? A. Yes, sir, just as they came into the tunnel. Q. When the station was called what did you do? A. I was fixing to get off; when the train stopped I began to prepare to get off. Q. How long did the train stay at the station? A. It seemed to me a short time—not more than two or two and a half minutes. Q. What preparation did you make to get off? A. I got up and got my overcoat and grip—I had my overcoat on—and I got my grip. My grip was sitting on the opposite— I had been on the opposite side away from that fellow— he seemed to be wearisome—and the aisle was kindly blocked with several fellows standing there talking and

I could not get out, and some parties came in getting on the train and kind-a bus'ted up the bunch and I started out. Q. After the station was called and the train stopped, tell the jury whether or not you delayed at all in making your efforts to get out? A. No, sir, not at all. Q. What prevented you from getting off at once, in other words, tell the jury whether or not anybody else crowded in before the passengers had time to alight? A. There was a bunch of men got there in the aisle talking and standing there, and I was standing there with my suit case in my hand, and when these men came in, two or three or four, they bus'ted that bunch up and then I got a chance to get out and went right out and just as I got to the steps to go down I took hold of the handle-bar with this hand (indicating) and had the suit case with this hand and the car gave an unusual hard jerk someway and the suit case went around that way and I made an effort to hold with this hand and fell, and I was right there. Q. What threw you off the platform? A. The jerk of the car. Q. Did you attempt to get off that car whilst it was moving? A. No, sir, it seemed to be perfectly steady as I took hold of the handle-bar and just as I went to step down it gave a jerk. Q. Describe the jerk to the jury and how you fell, and whether you had hold of anything at that time? A. Yes, sir, when the jerk came I had hold of the handle-bar with this hand and with this hand had the suit case and it gave a kind of a jerk or something and just as I went to make the first step, going down, I had to let go of the suit case and tried to grab with the right hand hold of the same handle-bar my left was on. I had the suit case in my hand, took and gave it a sling and reached around to grab the handle-bar, but I missed it. . . Q. Could you have gotten out any sooner than you did get out? (Objection; sustained). Q. I will ask you if you delayed any, yourself, from the time the train stopped, in getting out? A. No, sir, I did not. . . Q. After you got to the platform and put your foot on the first step, had the train started or not? A. No, sir, not when I started to make the step—I don't know whether my foot got to the step or not. It was in the action of getting to it, but I don't know whether my foot got to the step or not. I might have touched it but I don't remember—I was under excitement. . . Q. What happened to you as a result of this jerk? A. I was thrown off and struck something right along on this side of my head—

the left side—right up and down there, that seemed to paralyze me and had a gash cut right down over there about that long, and, of course, I was dead to the world and never knew any more. I don't know whether I hit the steps of the ladies' coach or the edge of the curb or platform or what—I was done then. Q. Did you lose your limb in the accident? A. Yes, sir. Q. Your left leg? A. Yes, sir. Q. Where was it cut off? A. Between the thigh and knee—just about an eight-inch stump.''

From this evidence it is manifest there was an unusual jerk, violent in its nature and apparently unnecessary, and if the jerk which he and the witness, Homer Wise, testify was made by the train caused him to fall and he was injured under the circumstances related above, undoubtedly he was entitled to have his case submitted to a jury. In every case where a passenger is exercising ordinary care for his own safety and is thrown from a train by a jerk or lurch in the operation thereof, he is entitled to go to a jury. Railway Company v. Osbourne, 157 Ky. 341; Southern Railway Co. in Ky. v. Neal, 164 Ky. 121. In the case of the Louisville & Nashville Company v. Kempe's Admr., 149 Ky. 344, it is said: ''In an action by a passenger to recover for an injury caused by a sudden jerk of the train, a peremptory instruction should not be given where there is evidence that the jerk was violent and unusual.''

It is true that the evidence for the defendant company shows that the plaintiff had been drinking somewhat on the occasion of his injury, but this is only a circumstance to be considered along with the other facts of the case. The judgment on the former appeal was reversed, as stated in the opinion, because there was ''absolutely no proof that any unusual number of passengers crowded on to the car and there was such an utter failure to produce evidence of any jerking start of the train, that the plaintiff himself abandons this theory by failing to offer any instruction upon it.'' This deficiency has been supplied by the evidence above quoted, and while the defendant may be able to produce evidence largely preponderating, still it is for the jury to say from all the evidence whether the defendant shall respond in damages.

Manifestly there is a substantial difference between the evidence given on the second trial and that produced upon the trial now under review, and we conclude, there-

fore, that the trial court erred in instructing the jury to find and return a verdict for the defendant company.

Judgment reversed for new trial in conformity to this and the former opinion.